# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| JAMES MICHAEL MURPHY, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. _____ |
| ) | |
| v. ) | |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## COMPLAINT

COMES NOW Plaintiff, by and through undersigned counsel, and files this Complaint for Damages against the United States of America as follows:

### PARTIES, JURISDICTION AND VENUE

1. This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq (the "Act") and concerns the treatment of Plaintiff James Michael Murphy ("Plaintiff" or "Mr. Murphy") by medical providers at the Birmingham VA Medical Center located at 700 South 19th Street, Birmingham, AL 35233, (hereinafter "Birmingham VAMC").

2. Mr. Murphy is a 73-year-old Marine Corps veteran, residing in Vandiver, Alabama, and, at all material times, was a patient of Birmingham VAMC.

3. Defendant United States of America ("United States") is a political entity acting through its agents and/or employees at Birmingham VAMC. The United States is the proper Defendant per the Act as Birmingham VAMC is a medical center in Birmingham, Alabama, that is operated the Veterans Health Administration, a division of the United States Department of Veterans Affairs.

4. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages for which this Complaint is made were proximately

caused by the negligence, wrongful acts, and/or omissions of its employees and/or agents.

5. Upon information and belief, at all material times, the United States owned, operated, maintained, or controlled Birmingham VAMC.

6. Upon information and belief, at all material times, all persons involved in the medical and health care services provided to Mr. Murphy at Birmingham VAMC, including but not limited to Kyle J. Rudemiller, MD ("Dr. Rudemiller"), Neil J. Steil, MD ("Dr. Steil"), Maria R. Cumagun, MD ("Dr. Cumagun"), Douglas S. Dickinson, MD ("Dr. Dickinson"), and Masood A. Khan, MD ("Dr. Khan"), and other medical and nursing staff, were agents, servants, and/or employees of United States as defined at 28 U.S.C. § 2671, and were acting within their course and scope of employment with the United States.

7. Whenever in this Complaint it is alleged that the United States did any act, or failed to do any act, it is meant that the officers, agents, members, managers, or employees of such Defendant performed, participated in, or failed to perform such acts while in the course and scope of their employment or agency relationship.

8. The United States may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the United States Attorney, Peter M. McCoy, Jr., United States Attorney for the Northern District of Alabama by certified mail, return receipt requested at:

> U.S. Attorney's Office
> Northern District of Alabama
> ATTN: Civil Process Clerk
> 1801 4th Avenue North
> Birmingham, Alabama 35203

9. Service is also perfected on the United States by serving a copy of the Summons and Complaint on Monty Wilkinson, Acting Attorney General for the United States in Washington, DC by certified mail, return receipt requested at:

>Acting Attorney General of the United States
>ATTN:  Civil Process Clerk
>U.S. Department of Justice
>950 Pennsylvania Avenue, NW
>Washington, DC 20530-0001

10. The substantive law of the State of Alabama applies to this lawsuit.

11. This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 28 U.S.C. § 1402. Venue in this action is proper in the Birmingham Division of the United States District Court for the Northern District of Alabama because the negligent and wrongful acts or omissions of the Defendant alleged herein were committed, in whole or in part, in Jefferson County, Alabama, which is within the Birmingham Division of the Northern District of Alabama.

## ADMINISTRATIVE PROCEDURE

12. Pursuant to 28 U.S.C. § 2675, Plaintiff filed his claim for damages and injuries with the Defendant. Said claims were received and accepted for filing by the U.S. Department of Veterans Affairs Office of General Counsel ("VA"), on September 8, 2020. A copy of said claim is attached hereto as Exhibit A.

13. The VA verified that Plaintiff's claim was received on September 8, 2020. A copy of said correspondence is attached hereto as Exhibit B.  Plaintiff was further advised that the VA had six (6) months from the date the claim was received to consider the claim. After six (6) months elapsed, no response from the VA has been received by Plaintiff.

## FACTUAL BACKGROUND

14. On November 12, 2018, Mr. Murphy presented to the Birmingham VAMC reporting difficulty urinating and a 2-day history of malaise and body aches, for which he had been taking Nyquil. Susan M. Camp, CRNP, and Dr. Steil, evaluated Mr. Murphy noting his history of an enlarged prostate and urinary retention.

15. A physical examination of Mr. Murphy revealed bladder distention, but was otherwise normal. Laboratory testing, including a urinalysis with urine culture, was ordered.

16. Initial laboratory results indicated an elevated white blood cell count and a rare bacterium in Mr. Murphy's urine.

17. Dr. Steil recommended Rocephin for a urinary tract infection; however, there was no documentation of Rocephin administration. Mr. Murphy was then discharged, with instructions to use ibuprofen for body aches.

18. On November 15, 2018, Mr. Murphy's final urine culture result returned positive for Enterococcus faecalis sensitive to ampicillin, penicillin, tetracycline and nitrofurantoin. However, Mr. Murphy was never notified of the culture results, and there is no documentation showing that results were reviewed by his medical provider.

19. On December 3, 2018, Mr. Murphy returned to the Birmingham VAMC, reporting muscle aches, urine retention, and right-hand pain, redness and swelling. Medical staff placed Mr. Murphy in a waiting room around 2:50 pm and he was not assessed again until approximately 10:20 pm.

20. Later than night, Dr. Rudemiller, evaluated Mr. Murphy noting some right-hand cellulitis and urinary symptoms similar to those reported at his prior Birmingham VAMC visit in November. Dr. Rudemiller suspected another UTI, but laboratory results were negative for such an infection. Dr. Rudemiller ordered an antibiotic for Mr. Murphy's right-hand cellulitis, tamsulosin to treat Mr. Murphy's enlarged prostate and Mr. Murphy was discharged home at 12:10 am on December 4, 2018.

21. On the morning of December 4, 2018, Mr. Murphy awoke and went to feed his cattle. While tending to his cattle, Mr. Murphy began suffering stroke-like symptoms and became

incapacitated. Over the course of approximately 7 hours, Mr. Murphy crawled back to his house where he was later discovered by his family who called 911 at approximately 4:48 pm.

22. At approximately 6:00 pm, Mr. Murphy arrived via emergency medical services ("EMS") to Grandview Medical Center's ("Grandview") emergency department ("ED"). Mr. Murphy exhibited severe symptoms including decreased responsiveness, right-sided weakness, and slurred speech. Grandview staff indicated diagnoses of altered mental status and potential stroke.

23. A brain computed tomography ("CT") scan was performed, which revealed hyperdense distal left middle cerebral artery ("MCA") that could be indicative of occluding arterial thrombus. Developing ischemia was suspected in the left MCA region with other asymmetric changes in the left basal ganglia and deep temporal cortex.

24. At 7:55 pm, Grandview staff initiated a neurological consultation with Mayank Mathur, M.D., and Dr. Mathur stated that Mr. Murphy's presentation was concerning for acute left-sided MCA territory ischemic stroke, and he recommended transfer to a higher level of care for possible mechanical thrombectomy by an interventionist.

25. At approximately 10:00 pm, Mr. Murphy was transferred to the University of Alabama-Birmingham ("UAB") Hospital and was accepted by UAB neurology. Imaging showed a left MCA thrombus with a hyperdense lesion and he was exhibiting expressive aphasia and right-sided weakness of his upper and lower extremities. A Code Stroke was called.

26. Further work-up, including head and neck CT angiography, CT scan and CT perfusion imaging, revealed thrombosis in Mr. Murphy's left MCA with possible core infarct along the left lateral temporal cortex. Mr. Murphy was admitted to UAB Hospital's neurology intensive care unit (NICU) for further evaluation, management and assessment for possible thrombectomy.

27. After consultation with Mr. Murphy's family and recommendation for a mechanical thrombectomy, William R. Stetler, Jr., MD, performed left MCA thrombectomy for occlusion with successful removal of all thrombus/clot material. Following the procedure, Mr. Murphy was extubated and taken to the NICU for monitoring.

28. On December 5, 2018, Angela H. Shapshak, MD, evaluated Mr. Murphy and documented the events that led to his neurosurgical intervention. She expressed concern for his embolic stroke of unknown source and planned to obtain Mr. Murphy's Birmingham VAMC records among other management.

29. On December 6, 2018, Vedran Oruc, MD, evaluated Mr. Murphy and noted that Mr. Murphy's blood cultures returned positive for gram positive cocci ("GPC bacteremia") and that he would require a transesophageal echocardiogram ("TEE"). The TEE showed mitral valve vegetation of the posterior valve with likely associated perforation and severe mitral regurgitation. Cardiology, cardiothoracic ("CT/CV") surgery and infectious disease ("ID") consults were recommended.

30. That same day, Mr. Murphy's final urine culture result from the December 3rd specimen also returned positive for Enterococcus faecalis with the same sensitivity as the November 12th specimen. Up to this point, Mr. Murphy had not been notified of the culture results by a Birmingham VAMC medical provider.

31. On December 7, 2018, James E. Davies, Jr., MD, evaluated Mr. Murphy and noted his history of Enterococcus UTI and right-hand cellulitis. Dr. Davies' physical examination further revealed a grade III systolic murmur, and he ordered a left heart catheterization ("LHC") to rule out coronary artery disease ("CAD").

32. Anderson S. Marshall, MD, and Mukesh Patel, MD, noted that Mr. Murphy's GPC bacteremia in cultures resulted in TEE with findings of mitral valve vegetation, perforation and

severe mitral regurgitation. CV surgery recommended an outpatient work up while IV antibiotic and stroke recovery were completed. Enterococcal mitral valve endocarditis with severe mitral regurgitation and bacteremia were added to Mr. Murphy's problem list.

33.     That same day, UAB Hospital's hospitalist service evaluated Mr. Murphy to assist with newly diagnosed endocarditis – moderate size mobile vegetation on the posterior mitral valve leaflet with probable perforation and severe mitral regurgitation. Mr. Murphy exhibited expressive aphasia, but tried to respond. Mr. Murphy's hospital course was also complicated by high grade Enterococcus faecalis bacteremia.

34.     On December 17, 2018, Dr. Davies attempted to repair Mr. Murphy's mitral valve but did not find it to be an acceptable long-term repair/solution as there appeared to be ongoing mitral regurgitation. Also noted was almost complete destruction of the posterior segment of Mr. Murphy's mitral valve, vegetation on the mitral valve leaflets that was causing severe mitral regurgitation and echogenic material on Mr. Murphy's pulmonic valve.

35.     On December 19, 2018, Mr. Murphy had a dual lumen PICC line placed for long-term venous access for medication administration.

36.     On December 20, 2018, Mr. Murphy's chest x-ray showed persistent small pleural effusions with mild patchy atelectasis, improving pulmonary edema, removal of the right internal jugular catheter and proper placement of PICC, and intact sternal wires.

37.     On December 21, 2018, Mr. Murphy was discharged home with home health, IV antibiotic therapy, and follow-up appointments.

38.     Since his discharge, Mr. Murphy has had numerous follow-up medical and home health visits to monitor and treat his recovery. He also continues to suffer residual deficits, including but not limited to, difficulty speaking and physical weakness.

## NEGLIGENCE

39. Plaintiff incorporates Paragraphs 1 through 38 as if fully set forth *verbatim*.

40. Defendant, individually, and while acting through healthcare providers employed or utilized by them at VAMC, owed a duty to Plaintiff to comply with the standard of care, skill, and diligence exercised by healthcare providers generally under similar conditions and like surrounding circumstances as those presented during Plaintiff's care and treatment at Birmingham VAMC and its affiliated health service providers.

41. Defendant, individually, and while acting through the healthcare providers employed or utilized by them at Birmingham VAMC, were negligent and breached the applicable standard of care with respect to their assessment, diagnosis, planning, care, treatment, and evaluation of Plaintiff.

42. The professional negligence and breaches of the applicable standard of care by Defendant included, but were not limited to, the following acts and omissions:

   a. Failure to timely administer appropriate antibiotics;

   b. Failure to follow-up regarding any of Mr. Murphy's urine culture results;

   c. Failure to have a healthcare provider review Mr. Murphy's test results;

   d. Failure to check treatment against results;

   e. Failure to notify or otherwise communicate with Mr. Murphy regarding his culture results;

   f. Failure to appreciate, assess, and diagnose Mr. Murphy's condition; and

   g. Failure to timely refer or recommend that Mr. Murphy seek additional consultation from specialized healthcare providers

43. As a direct and proximate result of the negligence of Defendant as described herein, Plaintiff suffered, and continues to suffer multiple injuries and damages, including, but not limited to: (a) embolic stroke and resulting deficits; (b) endocarditis; (c) vegetation on his mitral and pulmonic valve; (d) perforation of his posterior mitral valve leaflet; (e) severe mitral regurgitation; (f) bacteremia; (g) extended hospitalization, imaging studies, and surgical intervention, including left middle cerebral artery thrombectomy, left heart catheterization, and open heart surgery with extracorporeal circulation for mitral valve replacement; (h) additional follow-up medical visits; (i) impaired mobility and decline in his activities of daily living; (j) anticoagulation treatment; (k) antibiotic therapy; (l) discomfort and disability; (m) loss of independence; (n) loss of enjoyment of life; (o) increased stress and anxiety, (p) unnecessary pain and suffering, (q) violation of his rights, (r) significant medical expenses, and (s) other economic and non-economic damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays this Court for the following relief:

(a) That a process be issued and copy of this Complaint and Summons be served upon Defendant as provided by law;

(b) That Plaintiff recover a judgment against the Defendant in the form of compensatory damages in an amount as set forth in the claim attached as <u>Exhibit A</u>;

(c) That Plaintiff recover the costs of this action; and

(d) That the Court grant such other and further relief as it may deem just and proper.

Respectfully submitted, this the 23rd day of April, 2021.

s/ Kenneth L. Connor
Kenneth L. Connor, Al. Bar ID. 2930T62C
Attorney for Plaintiff
CONNOR & CONNOR, LLC

302 Park Avenue SE<br>
Aiken, South Carolina 29801<br>
Telephone: 803-226-0543<br>
Fax: 800-480-9715<br>
E-Mail: ken@theconnorfirm.com