FILED

2024 Jan-12  PM 02:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES MICHAEL MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:21-cv-00576-JHE |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

In this civil action, Plaintiff James Michael Murphy brings claims against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., based on allegations of medical malpractice arising out care he received at the Veterans Administration Medical Center ("VAMC") in Birmingham, Alabama.  The cause now comes to be heard on two pending motions by the United States: (1) one for summary judgment (Doc[2]. 32) and (2) another to exclude two of Murphy's medical experts.  (Doc. 29).  The motions have been fully briefed (*see* Docs. 29, 32, 38, 41, 45, 46), and the parties have filed evidence in support of their respective positions on the motions.  (Docs. 29, 33, 36, 38, 42).  For the reasons explained below, the United States's motion to exclude is due to be granted in part and denied in part, and its motion for summary judgment is due to be denied.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 8).

[2] Citations to "(Doc(s). ___")" are to the document number(s) of the pleadings, motions, and other materials in the court file, as compiled and numbered on the docket sheet by the Clerk of the Court.  Pinpoint citations to deposition testimony are to the page of the deposition transcript. Pinpoint citations to other documents are, unless otherwise noted, to the page of the electronically filed document in the CM/ECF system, which may not correspond to the pagination on the "hard copy" presented for filing.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere

'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Background[3]

The relevant events are essentially undisputed.  On the evening of November 12, 2018, Murphy, then a 71-year-old military veteran living in Vandiver, Alabama, drove himself to the emergency department at the VAMC in Birmingham, complaining of problems with urination, malaise, and body aches for the preceding couple of days.  (Doc. 42-2 ("VAMC Records") at 6-7).  Murphy was noted to have a history of enlarged prostate and that he been unable to void his bladder that day.  (VAMC Records at 7).  He was seen by Dr. Neal[4] Steil, a staff physician in the emergency department, who advised Murphy that his difficulty voiding was likely exacerbated by his taking Nyquil, an over-the-counter cold medicine.  (*Id.* at 7, 9).  Dr. Steil confirmed orders for a catheter to relieve Murphy's urine retention, as well as for laboratory tests that included a complete blood count ("CBC"), a urinalysis, and a urine culture.  (*Id.* at 8).  It was understood that the lab results other than for the urine culture would be returned in short order, while Murphy was still in the emergency room, but that the urine culture would take about two or three days.  (*See* Doc. 42-1 ("Dr. Steil Depo.") at 92).

---

[3] The background summary in this section is taken from the undersigned's review of the pleadings where uncontested and from the evidentiary materials in the court file. While the parties may dispute some facts, the evidence is presented here in the light most favorable to the non-movant, consistent with the applicable standard of review at summary judgment. Accordingly, these are the facts for purposes of the instant motions only; they may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[4] In their briefing, the parties spell Dr. Steil's first name "Neil." However, both the VAMC medical records and Dr. Steil's Linkedin page show his first name spelled as "Neal."  (*See* Doc. 42-2 at 6, 9, 10); https://www.linkedin.com/in/neal-steil-49562b111 (last visited November 6, 2023).

Based on Murphy's clinical presentation and the lab results other than the urine culture, Dr. Steil diagnosed a urinary tract infection ("UTI"), for which he ordered an intravenous antibiotic, Rosephin, and a prescription for a second, cephalosporin.  (VAMC Records at 9).  He directed Murphy to avoid Nyquil and furnished orders for ibuprofen for the body aches and tamsulosin, also known by its brand name, Flomax, for enlarged prostate.  (*Id.* at 9).  Murphy was discharged shortly before 11 p.m.  (*Id.* at 10).  At that time, he was instructed to follow up with his primary care doctor as a walk-in patient at the VAMC within "24-48 hours for a recheck and further care" and to return to the emergency room "for any emergent complaints including worsening or recurrent symptoms or any other problems."  (*Id.*)

Murphy did not return to the VAMC in Birmingham in the ensuing days, however, as either an emergency room or walk-in patient.  Nor did he see any other healthcare provider for urinary or any other physical complaints during the remainder of November 2018.  Rather, Murphy had only two visits with healthcare providers in that period, both with the VA and directed to his ongoing mental health issues.  First, on November 14, 2018, two days after his visit to the VAMC emergency department, Murphy had a "telehealth" appointment whereby he went to a VA clinic in Childersburg, Alabama; had his vital signs taken; and had a video call with a VA psychiatrist and nurse.  (VAMC Records at 14-22).  Likewise, on November 29, 2018, Murphy had a 60-minute psychotherapy session with a licensed VA clinical social worker.  (*Id.* at 23-25).  During both appointments, Murphy told the respective providers that he had recently been to the VAMC emergency room for a UTI but had been feeling better since.  (*Id.* at 17, 23).

Meanwhile, however, on November 15, 2018, three days after Murphy's discharge from the VAMC emergency room, the urine culture Dr. Steil had ordered in the ER came back from the lab.  (VAMC Records at 60-61).  It was positive for enterococcus faecalis bacteria and further

showed that the strain was not sensitive to either type of antibiotic that Dr. Steil had prescribed. (*Id.*; Dr. Steil Depo. at 82, 87-88).  And while there were other antibiotics to which the enterococcus would have been sensitive (VAMC Records at 60-61; Dr. Steil Depo. at 87-88), neither Dr. Steil nor any other VAMC staff followed up to contact Murphy and notify him of the urine culture result or to change his antibiotic prescription.  (Doc. 42-1 ("Murphy Depo.") at 85-86; Dr. Steil Depo. at 83-86)).

On Monday, December 3, 2018, Murphy drove himself back to the VAMC emergency department in Birmingham, where he was seen by another staff physician, Dr. Kyle Rudemiller. (VAMC Records at 26).  Murphy again reported symptoms like those documented on his prior visit on November 12th, including problems with urination and muscle aches and pains.  (*Id.* at 26, 28).  He was also complaining of a new problem: redness and swelling in his right hand, with a related pain score of 6 out of 10. (*Id.* at 26, 28, 30).  As to these various issues, Dr. Rudemiller documented the following:

> [Patient] … presents to the ER with complaint of [right] hand redness and pain along with difficulty urination.  As for the [right] hand he developed pain and swelling in it on Friday [November 30].  It then developed erythema [swelling] and lasted through the weekend. As for his urine he was previously on Flomax for BPH [enlarged prostate] but stopped it several months ago as he did not feel it was helping. He then presented here with pan-sensitive [enterococcus] faecalis UTI on [November 12] and took [antibiotics] and Flomax then.  Now that he ran ou[t] of Flomax again, he has had increasing difficulty urinating with some mild dysuria [painful or difficult urination].  He has also developed diffuse muscle aches and pains which he had the last time he had a UTI.  [Patient] denies any outright fevers or systemic signs of infection.

(*Id.* at 26).

When he saw Murphy on December 3rd, Dr. Rudemiller had access both to the records from the prior ER trip on November 12th and to the urine culture result from November 15th. (Doc. 42-4 ("Dr. Rudemiller Depo.") at 67-68, 75-76).  Dr. Rudemiller did look at the culture

result and recognized that Murphy had been diagnosed previously with an enterococcus UTI. (Dr. Rudemiller Depo. at 67-68, 75-76, 85, 88). Dr. Rudemiller also acknowledges that having reviewed the culture results for the strain's sensitivity to certain different antibiotics. (*Id.* at 85, 88-89). And while Dr. Rudemiller says he looked at the November 12thER notes, he does not recall looking specifically at the types of antibiotics that Dr. Steil had prescribed, nor whether the previously diagnosed enterococcus was sensitive to them. (*Id.* at 75-77). Rather, Dr. Rudemiller explains that, because Murphy had advised that he had felt better with resolving symptoms after the November 12th ER visit but then got worse after coming off the Flomax, Dr. Rudemiller believed that the prior treatment had been generally effective. (*Id.* at 79-80).

Dr. Rudemiller noted that Murphy's vital signs were normal, that he was "hemodynamically stable," and that he "looks well." (VAMC Records at 28). Dr. Rudemiller still suspected a "possible UTI," and he ordered basic labs like those administered on November 12th, including another urine culture. (*Id.*) When those basic lab results came back, however, Dr. Rudemiller interpreted them as negative for a UTI, and he did not prescribe an antibiotic related to Murphy's urinary condition. (*Id.* at 29). He diagnosed Murphy's right hand issue as a bacterial skin infection, cellulitis, for which he did prescribe an antibiotic, clindamycin. (*Id.* at 28, 29). However, like the antibiotics previously prescribed by Dr. Steil, the clindamycin was not effective against enterococcus faecalis bacteria. (*Id.*; Dr. Rudemiller Depo. at 101-103). Dr. Rudemiller also prescribed tamsulosin to treat Murphy's enlarged prostate. (VAMC Records at 29). Shortly after midnight on December 4, 2018, with Murphy stable, having normal vital signs, and reporting no pain, Dr. Rudemiller ordered him discharged, and Murphy drove himself home. (VAMC Records at 37; Murphy Depo. at 76).

6

Just a few hours later, however, on the morning of December 4, 2018, Murphy was tending cattle on his property in Vandiver when he suffered stroke-like symptoms and became incapacitated.  (Murphy Depo. at 76-77).  Over the course of the next several hours, he was able to crawl back to his house, where he was found on the floor of his kitchen by a family member at about 4:30 p.m.  (*Id.*)  Murphy was transported to the emergency department at Grandview Medical Center.  (*Id.*; Doc. 42-12).  Shortly thereafter, he was transferred to the University of Alabama-Birmingham ("UAB") Hospital, where he was admitted to the neurology intensive care unit.  (Doc. 42-11 ("UAB Records")).  He was determined there to have had an ischemic stroke caused by an arterial clot.  (UAB Records at 7-8).

On December 6, 2018, Murphy underwent testing that showed mitral valve vegetation of the posterior valve with like associated perforation and severe mitral regurgitation.  (UAB Records at 20-21, 48, 55).  On that same date, urine culture test from the specimen taken during Murphy's visit to the VAMC emergency department on December 3rd returned.  (VAMC Records at 60).  Like the November 12th urine culture specimen, it was again positive for enterococcus faecalis bacteria with the same antibiotic sensitivity range.  (*Id.*)  Enterococcal mitral valve endocarditis with severe mitral regurgitation and bacteremia were added to his diagnosis.  (UAB Records at 31-32, 44, 48). Ultimately, Murphy was required to undergo numerous medical tests, surgeries, procedures, and interventions related to the stroke.  He has also continued to suffer a variety of residual deficits, including difficulty speaking and physical weakness.

On April 23, 2021, Murphy filed this FTCA action against the United States.  (Doc. 1 ("Complaint").  His cause of action is based on allegations that Dr. Steil and Dr. Rudemiller were negligent in rendering medical care in connection with Murphy's visits to the emergency department on both November 12, 2018, and December 3, 2018.  More specifically, Murphy

alleges that "[1] Dr. Steil and Dr. Rudemiller failed to follow-up regarding Mr. Murphy's urine culture results; … [2] [both] failed to notify Mr. Murphy that his urinary tract infection was not being adequately treated; [3] [both] failed to change Mr. Murphy's antibiotic treatment; and [4] [that] Dr. Rudemiller failed to recognize that Mr. Murphy's treatment was not correct and hospitalize him on December 3, 2018." (Doc. 38 at 10; *see also* Doc. 41 at 11-12). Murphy claims that such omissions amounted to malpractice that caused him to suffer the stroke and exacerbated his associated injuries and treatment.

With discovery completed, the United States moved for summary judgment. (Doc. 32). The United States contemporaneously moved to exclude two of Murphy's proffered expert witnesses, Dr. Gerald Donowitz and Dr. James Sexson, on the basis that they purportedly are not "similarly situated" to Dr. Steil and Dr. Rudemiller, as required by Ala. Code § 6-5-548, a provision of the Alabama Medical Liability Act ("AMLA"), Ala. Code §§ 6-5-480 to -488, 6-5-544 to -552. (Doc. 29). Both motions are fully briefed and ripe for decision.

### III. Discussion

#### A. Applicable Law

"The FTCA was enacted to provide redress to injured individuals for ordinary torts recognized by state law but committed by federal employees." *Zelaya v. United States*, 781 F.3d 1315, 1323 (11th Cir. 2015). The FTCA thus authorizes suits against the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government ... under circumstances where ... a private person ... would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Because the events here occurred in Alabama, the claim is governed by Alabama substantive law, including the AMLA. *See Magee v. United States*, 2023 WL 4623611, at *3 (11th Cir. July 19, 2023);

*Hammonds v. United States*, 418 F. App'x 853, 855 (11th Cir. 2011); *Stone v. United States*, 373 F.3d 1129, 1130 (11th Cir. 2004).  In FTCA cases, federal courts are to apply state law the way they determine it would be applied by the courts of the relevant state, bound by caselaw of the state's highest court.  *See Bravo v. United States*, 532 F.3d 1154, 1164 (11th Cir. 2008), *reh'g denied*, 577 F.3d 1324 (11th Cir. 2009).

To establish liability for medical malpractice in Alabama, the plaintiff bears the burden at trial to prove: (1) the appropriate standard of care, (2) a deviation from that standard, and (3) a proximate causal connection between the deviation and the plaintiff's injury.  *Magee*, 2023 WL 4623611, at *3 (citing *Hauseman v. University of Ala. Health Servs. Found.*, 793 So. 2d 730, 734 (Ala. 2000)).  A plaintiff typically must prove their claim through testimony from a medical expert who is "similarly situated" to the healthcare provider whose acts or omissions gave rise to the action.  *See* Ala. Code § 6-5-548(b), (c), (e); *Magee*, 2023 WL 4623611, at *3-4; *Iacullo v. United States*, 657 F. App'x 916, 917 (11th Cir. 2016); *University of Ala. Health Servs. Found. v. Bush*, 638 So. 2d 794, 802 (Ala. 1994).

## B.  The Motion to Exclude

In conjunction with the filing of its motion for summary judgment, the United States has moved to exclude two of Murphy's would-be medical experts, Dr. Donowitz and Dr. Sexson.  The United States contends that their testimony is inadmissible under Ala. Code § 6-5-548(e), on the ground that those physicians are not "similarly situated" to Dr. Steil and Dr. Rudemiller, who saw Murphy in the VAMC emergency department on November 12th and December 3rd, respectively.[5] (Doc. 29 at 8-14).  The resolution of the motion also bears significantly upon the United States's

---

[5]"At this stage of the proceedings, the United States does not take issue with either of Plaintiff's expert physician's methodologies.  Neither does the United States argue that, as physicians of a certain practice, board certification, and specialty, they are unqualified to offer expert opinions in other matters."  (Doc. 29 at 13-14).

other pending motion, for summary judgment.  That is, the United States contends that it is entitled to prevail because Murphy allegedly cannot establish that Dr. Steil or Dr. Rudemiller breached the standard of care or that any breach proximately caused Murphy's stroke and related injuries. Murphy, in turn, relies substantially upon testimony from Drs. Donowitz and Sexson to establish those same essential elements of his malpractice claim.  Indeed, the United States argues expressly that, without their expert testimony, Murphy cannot carry his burden of proof and that summary judgment necessarily follows.  (Doc. 32 at 18; Doc. 46 at 3 n. 1).  Accordingly, the undersigned considers the motion to exclude at the outset, because its resolution will substantially affect what evidence might be properly considered on the summary judgment motion.

The proponent of expert testimony bears the burden at trial to establish the witness's qualifications and other requirements of Rule 702, Fed. R. Evid.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).  However, a party seeking to preclude his opponent's expert testimony by way of a motion *prior to trial* must "make a threshold showing sufficient to indicate that his adversary will be unable to meet his burden at trial with regard to the testimony." *United States v. An Easement & Right-of-way Over 6.09 Acres of Land, More or Less, in Madison Cnty., Alabama*, 140 F. Supp. 3d 1218, 1236 (N.D. Ala. 2015).  Once the movant does so, the burden shifts to the proponent of the witness to demonstrate that the challenged expert requirements are met.  *Id.*  This approach is akin to the shifting evidentiary burdens on a motion for summary judgment.  *See id.* (*citing* Andrew I. Gavil, *Defining Reliable Forensic Economics in the Post–Daubert/Kumho Tire Era: Case Studies from Antitrust*, 57 Wash. & Lee L. Rev. 831, 849 & n. 76 (2000)).

The parties agree that Ala. Code § 6-5-548 applies to the determination of whether Drs. Donowitz and Sexson are qualified to give expert medical testimony in this FTCA action.  Under

§ 6-5-548(e), a health care provider may testify as an expert witness in a medical malpractice action in Alabama "only if he or she is a 'similarly situated health care provider'" as that phrase is defined elsewhere in § 6-5-548, specifically in its subsections (b) and (c). *See Hegarty v. Hudson*, 123 So. 3d 945, 950 (Ala. 2013); *Holcomb v. Carraway*, 945 So. 2d 1009, 1012-13 (Ala. 2006). Those subsections define a "similarly situated" provider differently depending upon whether a defendant provider is a "specialist" or a "nonspecialist." *Holcomb*, 945 So. 2d at 1013. Subsection (b) applies to nonspecialists, providing as follows:

> (b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a "similarly situated health care provider" is one who meets all of the following qualifications:
>
> > (1) Is licensed by the appropriate regulatory board or agency of this or some other state.
> >
> > (2) Is trained and experienced in the same discipline or school of practice.
> >
> > (3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.

Ala. Code § 6-5-548(b). In turn, subsection (c) applies to specialists, providing:

> (c) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is certified by an appropriate American board as a specialist, is trained and experienced in a medical specialty, and holds himself or herself out as a specialist, a "similarly situated health care provider" is one who meets all of the following requirements:
>
> > (1) Is licensed by the appropriate regulatory board or agency of this or some other state.
> >
> > (2) Is trained and experienced in the same specialty.
> >
> > (3) Is certified by an appropriate American board in the same specialty.

> (4) Has practiced in this specialty during the year preceding the date that the
> alleged breach of the standard of care occurred.

Ala. Code § 6-5-548(c).

The Alabama Supreme Court has established a three-part test for determining whether a medical expert is qualified to testify in a medical-malpractice action subject to the AMLA:

> A court[6] must determine (1) the standard of care the plaintiff alleges the defendant breached; (2) whether the defendant who is alleged to have breached the standard of care is a specialist in the area of care in which the breach is alleged to have occurred; and (3) whether the expert is qualified under the criteria set out in the relevant statute.

*Chapman v. Smith*, 893 So. 2d 293, 296 (Ala. 2004) (quoting *Ex parte Waddail*, 827 So. 2d 789, 793 (Ala. 2001) (citing *Medlin v. Crosby*, 583 So. 2d 1290, 1293 (Ala. 1991) (footnote added)).

Where the defendant is not a natural person, as here[7], the focus in applying the "similarly situated" analysis under subsections (b) and (c) is on the individual practitioner whose specific action, taken on behalf of the defendant, allegedly fell below the standard of care.  *See Hill v. Fairfield Nursing & Rehab. Ctr.*, *LLC*, 134 So. 3d 396, 403 (Ala. 2013); *Husby v. South Ala. Nursing Home, Inc.*, 712 So. 2d 750, 753 (Ala. 1998).

---

[6] Murphy seems to suggest at one point that he might be entitled to have the testimony of his experts considered at summary judgment so long as "genuine issues of material fact exist as to whether [those] experts are similarly situated healthcare providers" under Ala. Code § 6-5-548. (Doc. 41 at 9).  However, determining whether witnesses are qualified to testify as experts is a legal question for the trial court to decide, not an issue for the trier of fact.  *See Briggs v. Birmingham Ry., Light & Power Co.*, 69 So. 926, 927 (Ala. 1915); *Douglass v. State*, 107 So. 791, 796 (Ala. Ct. App. 1926); *Collar v. Collar,* 2005 WL 1268909, at *4 (E.D. Wis. May 27, 2005).  The qualification issue is therefore not subject to a summary-judgment-type analysis in which the record must be viewed in the light most favorable to the non-movant. *See, e.g., Sherrer v. Embry*, 963 So. 2d 79, 81 (Ala. 2007) (reciting different review standards for the trial court's determination regarding expert qualification under § 6-5-548 and its grant of summary judgment).

[7] The United States is the only proper defendant in an FTCA action.  *See Simpson v. Holder*, 184 F. App'x 904, 908 (11th Cir. 2006).

### 1.   Is the "Similarly Situated" Inquiry Governed by § 6-5-548(b) or (c)?

Murphy's claim focuses upon alleged breaches of the standard of care by Dr. Steil and Dr. Rudemiller, and it is they to whom Murphy's identified experts, Dr. Donowitz and Dr. Sexson, must be similarly situated under § 5-4-548.[8]  The parties disagree, however, on whether the motion is subject to subsection (b) or (c).   The United States argues that subsection (b) applies, not subsection (c).  The United States contends that, because Drs. Steil and Rudemiller treated Murphy while working as staff physicians assigned to the VAMC emergency department, they were practicing "emergency medicine."  And because Drs. Steil and Rudemiller were not board-certified in the specialty of emergency medicine, the United States continues, the "similarly situated" inquiry is subject to § 6-5-548(b), applicable to nonspecialists.

Murphy argues conversely that subsection (c) applies, not subsection (b).   Murphy acknowledges that Drs. Steil and Rudemiller were both working in the emergency room when they treated Murphy.   Murphy contends, however, that Drs. Steil and Rudemiller were practicing in their board-certified specialty of internal medicine.   Murphy claims that, because Drs. Donowitz and Sexson shared that same specialty and practiced in it during the year preceding the alleged breaches, they are qualified under § 6-5-548(c).  Alternatively, Murphy argues that if subsection (b) does apply, Drs. Donowitz and Sexson are "similarly situated" under its criteria.

---

[8] The United States's motion to exclude also discusses at times whether the standard of care might have also potentially been breached by a Certified Nurse Practitioner, Susan Camp, who examined Murphy in the VAMC emergency room before he was seen by Dr. Steil.  (See Doc. 29 at 2, 5, 6, 9, 11).   While Camp is mentioned once in the Complaint (*see* Complaint, ¶ 14), Murphy's opposition to the motion to exclude does not mention her at all. (*See* Doc. 38). Accordingly, in deciding the motion to exclude, the undersigned need not address whether Dr. Donowitz or Dr. Sexson might be similarly situated to Nurse Camp.

Accordingly, the undersigned must determine at the outset whether the United States's motion to exclude is governed by subsection (b) or (c). For the reasons explained below, the undersigned agrees with the United States that it is the former.

"The [AMLA] does not require that the defendant health care provider and the expert witness have identical training, experience, or types of practice, or even the same specialties." *Rogers v. Adams*, 657 So. 2d 838, 842 (Ala. 1995). Rather, "[t]o be 'similarly situated,' an expert witness must be able to testify about the standard of care alleged to have been breached in the procedure that is involved in the case." *Id.* To that end, "for the purposes of determining whether a defendant doctor is a 'specialist' under [§ 6-5-548](c), 'the trial court should look to whether the defendant "health care provider" is board-certified in the specialty or discipline or school of practice *that covers the area of the alleged breach*.'" *Holly v. Huntsville Hosp.*, 865 So. 2d 1177, 1185–86 (Ala. 2003) (quoting *Ex parte Waddail*, 827 So. 2d at 793 (quoting *Medlin*, 583 So. 2d at 1294)) (emphasis in *Waddail* and *Holly*). "In other words, … a defendant board-certified health-care provider practicing outside his specialty in undertaking the allegedly negligent treatment is not a 'specialist'" for purposes of either subsection (c) or (e) of § 6-5-548. *Id.* at 1186.

Murphy's claim focuses on alleged breaches of the standard of care by Drs. Steil and Rudemiller while working as emergency room staff physicians.[9] Murphy first asserts that,

---

[9] Murphy admits that Dr. Steil was a "staff physician" in the VAMC emergency department. (Doc. 38 at 9; *see also* Dr. Steil Depo. at 15-16). Murphy claims, however, that Dr. Rudemiller was a "hospitalist" when he saw Murphy. (Doc. 38 at 9). Murphy does not explore the distinction except insofar as he later points out that Dr. Sexson is a hospitalist, which Murphy asserts is "the same position as Dr. Rudemiller." (Doc. 38 at 11). However, emergency room doctors and hospitalists generally play different roles within a hospital. *See Ansley v. Inmed Group, Inc.*, 265 So. 3d 247, 250 (Ala. 2018) (parties agreed that "a hospitalist is a physician who works in a hospital and decides whether to admit patients to the hospital, primarily from the emergency room" and that "it is common in small hospitals for a hospitalist to also serve as an emergency-room physician"); *Texienne Hosp. Sys. L.P. v. KKU Surgical Mgmt., LLC*, 2022 WL 1310918, at *4 (Tex. App. May 3, 2022) ("A hospitalist is similar to an emergency room physician, but a

following his discharge from the ER on November 12th, Dr. Steil failed to follow up the urine culture lab he had ordered for Murphy in the ER and then failed, when that lab result came back on November 15th, to ensure that Murphy was contacted and told to change his antibiotic regimen accordingly.  Second, Murphy points to Dr. Rudemiller's failure, upon Murphy's return to the ER on December 3rd, to admit him to the hospital, based on Murphy's clinical presentation and a review and proper consideration of the prior urine culture result and the records from the November 12th visit, which disclosed that Murphy's UTI diagnosed on the prior visit had effectively gone untreated.

In three separate cases, the Alabama Supreme Court has held that defendants alleged to have breached the standard of care while serving as emergency room physicians were practicing "emergency medicine" for purposes of § 6-5-548.  *See Medlin*, 583 So. 2d at 1296; *Ex parte Waddail*, 827 So. 2d at 793; *Holly*, 865 So. 2d at 1186-87; *accord Ashton v. Florala Mem'l Hosp.*, 2007 WL 1526839, at *3 (M.D. Ala. May 24, 2007) (holding that defendant on-call emergency room doctor was practicing emergency medicine such that plaintiff's expert ophthalmologist who later performed eye surgery on him was not qualified to testify against the defendant under § 6-5-

---

hospitalist primarily treats patients after they have been admitted into the hospital, and the hospitalist prepares those patients for their discharge to their primary care physicians."); *Galuten on behalf of Est. of Galuten v. Williamson Cnty. Hosp. Dist.*, 2020 WL 7129022, at *2 (M.D. Tenn. Dec. 4, 2020) (recognizing that the decedent "was not treated by emergency department physicians; rather she was treated by hospitalists/internal medicine physicians").  Whatever the difference in title might imply, however, it is immaterial for instant purposes because the record shows without dispute that Dr. Rudemiller was, like Dr. Steil, an emergency room staff physician at the VAMC when he saw Murphy.  Dr. Rudemiller testified as much, stating that "during [his] service at the VA," he has "always worked in the emergency room" and "not on the floor as a hospitalist."  (Dr. Rudemiller Depo. at 28).  Murphy cites other portions of Dr. Rudemiller's deposition as purporting to show he was working a hospitalist.  (Doc. 38 at 9 (citing Dr. Rudemiller Depo. at 7, 8, 22-23).  However, those cites do not support that proposition.  Rather, Dr. Rudemiller acknowledges there merely that he has worked as a hospitalist *while employed by the University of Alabama Health Services Foundation* in connection with his service at *UAB University Hospital*.  (*See* Dr. Rudemiller Depo. at 8, 16).  Of course, Dr. Rudemiller saw Murphy at the VAMC, not UAB Hospital.

548).  The Alabama Supreme Court similarly held in another case that a plaintiff's nursing expert

was not qualified to testify to breach of standard of care by a defendant emergency room nurse in

placing incorrect identification tags on the bodies of accident victims where the expert "admitted

she was not an expert in emergency room procedures."  *Jordan v. Brantley*, 589 So. 2d 680, 683

(Ala. 1991).  The Court further concluded in *Medlin*, *Waddail*, and *Holly* that, although those

defendant physicians were board-certified in the specialty of *family* medicine, because they were

not board-certified in *emergency* medicine, they were acting as nonspecialists such that the

"similarly situated" issue was governed by § 6-5-548(b), not subsection (c).  *See Medlin*, 583 So.

2d at 1296; *Ex parte Waddail*, 827 So. 2d at 793; *Holly*, 865 So. 2d at 1186-87.  Thus, "[i]n *Medlin*,

[*Ex parte Waddail*, and *Holly*, the Alabama Supreme] Court appeared to treat the emergency-room

practice of the physician defendant in each case as part of a discipline or school of practice beyond

or different from the field of family practice in which the defendant was board-certified."  *Hegarty*,

123 So. 3d at 952 (Murdock, J., concurring specially).

      Like the defendant physicians in *Medlin*, *Waddail*, and *Holly*, Drs. Steil and Rudemiller

are alleged to have breached the standard of care while working as emergency room staff doctors

who saw a patient who randomly presented there.  Based on those precedents, the undersigned

finds that Drs. Steil and Rudemiller were practicing emergency medicine at the time of their

relevant alleged omissions.  And because neither is board-certified in emergency medicine, those

same cases further dictate that a similarly situated expert must meet the criteria for nonspecialists

under § 6-5-548(b).

      Murphy's argument that Drs. Steil and Rudemiller were instead practicing their board-

certification specialty "internal medicine … in acute-care hospital settings" (Doc. 38 at 9) is

unpersuasive.  If Murphy were correct in that characterization, it would be significant.  Namely, §

6-5-548(c) would apply, and the United States makes no argument that Dr. Sexson or Dr. Donowitz, who were undisputedly licensed physicians, trained, and practicing as board-certified internists, would not be similarly situated under that provision. However, the section of Murphy's brief arguing for § 6-5-548(c) conspicuously fails to cite a single case to support his interpretation, or any other point, for that matter. (*See id.* at 8-14). Moreover, internal medicine and emergency medicine are distinct specialty areas recognized by the American Board of Medical Specialties, *see Panayiotou v. Johnson*, 995 So. 2d 871, 874 n. 3 (Ala. 2008); https://www.abms.org/member-boards/specialty-subspecialty-certificates/ (last visited November 7, 2023), with separate residency training programs. (*See* Doc. 29-1, Declaration of Dr. Karen Jubanyik, ¶ 10). And while there is an overlap, there is also material distinction between the general practice of internal medicine and "the traditional Emergency Medicine functions of evaluating and treating acute patients with unforeseen illness or injury as they walk through the door of the hospital, examining them, diagnosing their conditions, and making decisions regarding disposition from the emergency department." (*Id.*, ¶ 11; *see also* Dr. Donowitz Depo. at 33-35 ("There's an overlap. So there are things that emergency room doctors do that internal medicine doctors do not do. … It's a Venn diagram where they share some commonality, but there are other things that they do separate."). Drs. Steil and Rudemiller were both performing traditional emergency medicine functions in their dealings with Murphy; each was the first and only physician to see Murphy in the ER on each respective visit, and those were the first and only times Drs. Steil and Rudemiller ever saw Murphy.

Again, *Medlin*, *Waddail*, and *Holly* each held that a physician working in an emergency room was practicing emergency medicine as a materially distinct field or discipline, even though each was board-certified in a different specialty. To be sure, those cases involved defendant emergency room physicians board certified in *family* medicine rather than *internal* medicine.

However, "because both internists and family practice physicians are primary care physicians, there are many similarities between their practices." *Short v. United States*, 908 F. Supp. 227, 234 (D. Vt. 1995); *see also Zachariah v. Durtschi*, 2022 WL 1509303, at *10 (Tex. App. May 13, 2022) ("[F]amily practice and internal medicine are substantially similar.  Internal medicine practitioners treat only adults, and family medicine practitioners treat adults and children, but internal medicine and family practice physicians function as primary care physicians.").  Nothing in *Medlin*, *Waddail*, or *Holly* hints that the Alabama Supreme Court would not have found those defendant emergency room physicians to have been practicing emergency medicine had they been certified in internal medicine instead of family medicine, and Murphy cites no authority to the contrary.  Indeed, in *Medlin*, the Court held that the plaintiff's expert certified in internal medicine was qualified to testify against the defendant emergency room doctor certified in family practice specifically because the defendant's alleged malpractice had "occurred in the emergency room" and "both doctors practice emergency medicine."  583 So. 2d at 1293.

Having determined that Dr. Steil and Dr. Rudemiller were practicing emergency medicine as nonspecialists and that § 6-5-548(b) applies, the next issue is whether Dr. Donowitz and/or Dr. Sexson are "similarly situated" under that provision.  Again, the statute requires a medical expert to have been "(1) … licensed by the appropriate regulatory board or agency, (2) … trained and experienced in the same discipline or school of practice," and "(3) [to have] practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred."  Ala. Code § 6-5-548(b).

The United States concedes the first two statutory elements but challenges the third, contending that neither Dr. Donowitz nor Dr. Sexson "practiced in the discipline or school of practice" of emergency medicine in the year preceding the alleged breaches.  Ala. Code § 6-5-

548(b)(3).  In support, the United States emphasizes that Dr. Rudemiller and Dr. Steil's practice at the Birmingham VAMC was limited "*exclusively*" to an emergency department setting.  (Doc. 29 at 5, 11, 12; Doc. 45 at 2, 5 (emphasis original)).  In fact, while conceding that "neither Dr. Rudemiller nor Dr. Steil is board-certified in emergency medicine," the United States goes so far as to assert that they are "*specialists* in *emergency medicine*."  (Doc. 29 at 3 (emphasis added); *see also* Doc. 45 at 2 (arguing that Drs. Donowitz and Sexson are due to be excluded because they did "not practice in the *emergency room specialty* during" the relevant period) (emphasis added, brackets omitted)).  By contrast, the United States highlights, "Drs. Donowitz and Sexson are, by their own admission, not emergency room physicians," which, according to the United States, means they are "thus not 'similarly situated' within the meaning of the AMLA."  (*Id.* at 11). Finally, the United States seeks to attack the qualifications of Drs. Donowitz and Sexson with testimony from one of its own retained experts, Dr. Karen Jubanyik, who is board-certified in emergency medicine and teaches the subject at Yale Medical School.  Specifically, Dr. Jubanyik opines that neither Dr. Steil nor Dr. Rudemiller "practices sufficiently in an Emergency Department setting in the role of an emergency provider to provide opinions in the field of Emergency Medicine."  (Doc. 29 at 12 (quoting Doc. 29-1, Jubanyik Decl., ¶ 9).

Several of the United States's arguments here are somewhat off the mark.  First, whether a witness is qualified to testify as an expert is a question of law for the court alone to decide.  *See* Rule 104(a), Fed. R. Evid.; *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614–15 (5th Cir. 2018); *Briggs v. Birmingham Ry., Light & Power Co.*, 69 So. 926, 927 (Ala. 1915).  Further, "questions of law are not subject to expert testimony."  *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir. 2018).  The undersigned thus agrees with Murphy that it is not proper for one expert to opine on whether another expert is qualified to testify.  *See Carroll v.*

*Trump*, 2023 WL 2652636, at *2 n. 12 (S.D.N.Y. Mar. 27, 2023) ("[[D]efendant's expert] may not opine on the qualification of another expert to testify on a particular subject.... That ... is a judicial function....") (*quoting Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 142 (S.D.N.Y. 2022)); *see also United States v. Wainwright*, 413 F.2d 796, 800 (10th Cir. 1969) (holding district court "rightly" excluded counsel's question asking his expert whether he would "have any opinion on the qualifications" of another expert based on his having given a certain opinion); *Underhill v. Coleman Co.*, 2013 WL 5399941, at *2–3 (S.D. Ill. Sept. 26, 2013) (striking expert's opinion "attacking [another expert's] qualifications" as "not proper expert witness testimony"), *aff'd*, 2013 WL 6068479 (S.D. Ill. Nov. 18, 2013); *Kehler v. Bridgestone Americas Tire Operations, LLC*, 2016 WL 8316771, at *3 (D. Wyo. Dec. 1, 2016) (holding that expert's "testimony regarding the qualifications of other experts … is not proper expert testimony"); *see also Mann v. Taser Int'l, Inc.*, 2007 WL 9712075, at *10 nn. 11 & 16 (N.D. Ga. Dec. 27, 2007) (holding that experts who sought to testify that other experts were qualified to testify were "simply acting as … well-qualified 'oath helper[s]'" whose testimony was "of little relevance" and "no substantial help to the Court"). Her Affidavit and Rule 26 Report consequently provide little assistance to the Court in evaluating Ms. Miller's opinions.  The undersigned therefore does not rely on Dr. Jubanyik's opinion that Drs. Donowitz and Sexson do not have sufficient experience in emergency medicine to be qualified to give expert testimony on the subject.[10]

---

[10] That is not to say, however, that the undesigned might not consider~~upon~~ testimony by Dr. Jubanyik on other matters, including as it relates to the contours and scope of the practice of emergency medicine and the standard of care for emergency medicine.  Likewise, the undersigned recognizes that it might be appropriate for one expert to assert at trial that another expert lacks education, training, and/or experience in a certain area such that the second expert's opinions should not be credited by the factfinder.

Second, the United States's assertion that Dr. Rudemiller and Dr. Steil are "specialists in emergency medicine" for purposes of § 6-5-548 is also wrong.  *Medlin*, *Waddail*, and *Holly* make clear that to be considered a "specialist" in emergency medicine under the statute, a defendant physician must have been, among other things, "certified by an appropriate American board" *in that area of practice*.  Ala. Code § 6-5-548(c).  While Drs. Rudemiller and Steil are board-certified in the specialty of internal medicine, they are undisputedly not board-certified in emergency medicine.

Third and finally, the United States is also incorrect to the extent that it suggests that, to qualify as similarly situated, Drs. Donowitz and Sexson must have served as full-time emergency room staff physicians like Drs. Rudemiller and Steil.  Section 6-5-548(b)(3) requires only that the expert has "practiced in the same discipline or school of practice" at issue in the year preceding the alleged breach.  As highlighted in *Medlin*, "the statute does not specify the amount of time spent practicing or the nature and quality of the practice."  583 So. 2d at 1296.  Nor does it require an expert to have practiced in "*the exact setting* in which the defendant doctor practices."  *Spencer v. Remillard*, 325 So. 3d 747, 765 (Ala. 2020) (emphasis original)[11]; *see also McBride v. Houston Cnty. Health Care Auth.*, 2014 WL 4373187, at *6 (M.D. Ala. Sept. 3, 2014) ("Clearly, [§ 6-5-548(b)(3)] does not require an expert witness to serve in a nearly identical role").

As Murphy argues, the Alabama Supreme Court applied such principles in *Medlin* to hold that the plaintiff's expert met the requirements of § 6-5-548(b)(3) to testify against a "full-time emergency room physician," 583 So. 2d at 1292, even though the expert was not himself also one.

---

[11] In *Spencer*, the Alabama Supreme Court discussed the requirement under § 6-5-548(c)(4) that an expert must have "practiced" within the same "specialty" as a defendant specialist in the year preceding the alleged breach.  However, the Court recognized that the "practice" requirement of subsection (c)(4) is sufficiently similar to the "practice" requirement of § 6-5-548(b)(3) that precedents interpreting one may be instructive when interpreting the other. *McGill v. Szymela*, 330 So. 3d 453, 458 & n. 2 (Ala. 2020).

*Id.* at 1296-97.  The expert there testified, rather, that he spent most of his time working for his company that prepared and presented educational and training programs in emergency response planning for industrial accidents and medical and paramedical response issues.  *Id.* at 1296.  The Court nevertheless held that the expert, an assistant clinical professor who taught "medical students in emergency medicine" at Yale Medical School, had "practiced emergency medicine" in the year preceding the breach.  *Id.*  In particular, the Court observed that the evidence showed that the expert "saw patients … in the emergency department for the purpose of teaching" and had "responsibilities [that] included seeing patients who presented in the emergency room and participat[ing] in the diagnosis and the treatment of the patient."  *Id.*

The Middle District reached similar conclusions in *McBride*, *supra*.  That plaintiff raised a host of claims, among them allegations of medical malpractice under the AMLA against a nurse and two psychiatrists, arising out of treatment the plaintiff received as a psychiatric inpatient. *See McBride*, 2014 WL 4373187, at *1-2; *see also McBride v. Houston Cnty. Health Care Auth.*, 2015 WL 3892715, at *1–2 (M.D. Ala. June 24, 2015).  As here, the defendants sought to exclude experts for the plaintiff on the ground that they were not "similarly situated" under § 6-5-548. *McBride*, 2014 WL 4373187, at *1-2.  The court first considered the plaintiff's expert aligned with the defendant nurse, finding that the relevant practice area was "psychiatric nursing."  *Id.*, at *2. The only point of contention was whether the expert met the "practice" requirement of § 6-5-548(b)(3).  While the defendant was a full-time nurse in an inpatient psychiatric facility, the expert had not held such a position in decades.  *Id.*, at *3.  Even so, the court found the expert was qualified to testify based on evidence that, as an adjunct nursing instructor and psychiatric clinical supervisor to nursing students, she had provided "hands-on nursing care" to patients in a psychiatric unit in the year preceding the breach.  *Id.*, at *3-4.

22

The *McBride* court likewise found the plaintiff's two expert psychiatrists were "similarly situated" under § 6-5-548(b)(3) despite not lining up in all particulars with the corresponding defendants. 2014 WL 4373187, at *4-6.  Specifically, the defendants argued that the plaintiff's experts were not similarly situated because, although licensed and trained psychiatrists like the defendants, the experts had "not served in an in-patient psychiatry environment in the year preceding the alleged breach because they served as clinical professors in psychiatry and practiced out-patient psychiatry."  *Id.*, at *5.  The defendants similarly claimed that, because one of defendant psychiatrist had been "covering" for the other while he was out of town when the alleged breach occurred, the plaintiff's expert had to show that she had served as a "covering psychiatrist" in the year preceding the breach.  *Id.*  The court rejected the defendants' position, casting it as improperly demanding the experts to be "*identically* situated" while the statue required only that they be "*similarly* situated."  *Id.* (emphasis original).  The court found, rather, that it was sufficient that the plaintiff's experts had "s[een], diagnosed, and treated psychiatric patients" in an outpatient setting during the relevant period.  *Id.*, at *6.

The question remains, however, whether, during the relevant period, Dr. Sexson and/or Dr. Donowitz "practiced" emergency medicine for purposes of § 6-5-548(b)(3).  Murphy argues that both doctors did so, relying on *Medlin*.  As in that case, Murphy's experts are admittedly not emergency room staff physicians.  But unlike there, Murphy's experts also do not "instruct medical students in emergency medicine" and see "patients in an emergency department for the purpose of [such] teaching."  *See Medlin*, 583 So. 2d at 1296.  Nevertheless, the record shows that both of Murphy's experts did "see" patients in an emergency room setting in at least some capacity; the issue, though, is whether the nature and extent of either's activities is sufficient to show the "practice" of emergency medicine.  To that end, "a trial court has wide latitude in deciding whether

23

to admit or exclude as witnesses medical experts whose work in the year preceding the breach was at the margins of active medical practice." *McGill v. Szymela*, 330 So. 3d 453, 459 (Ala. 2020).

### 2. Dr. Sexson

The undersigned first considers Dr. Sexson.  During the relevant period, he served as an internist and hospitalist at several different facilities.  (Doc. 42-6, Dr. Sexson Depo. at 55-56). While hospitalists are not "emergency room doctors" as such, *see* note 9, *supra*, Dr. Sexson testified that he would "go to the ER on a daily basis" (*id.* at 102) and would spend about 30 to 40 percent of his time there.  (*Id.* at 121).  Dr. Sexson further states that he would "evaluate patients in the emergency room, admit patients from the emergency room, [and] take care of them in the hospital."  (*Id.* at 57; *see also id.* at 60).  Dr. Sexson also claims, that during the relevant period, he "performed similar activities [to Dr. Steil] as an internal medicine physician in the context of an emergency room setting" and "treated patients not only in an emergency room setting but other settings who presented with signs and symptoms of urinary tract infection similar to those presented by Mr. Murphy."  (Dr. Sexson Depo. at 144).  The undersigned finds that Dr. Sexson's testimony sufficiently establishes that he "practiced" emergency medicine to satisfy subsection (b)(3), based on the reasoning in *Medlin* and *McBride*, *supra*.

The United States makes several arguments in opposition, none of which is sufficiently convincing.  First, the United States emphasizes that Dr. Sexson himself admitted in his deposition that he does not "consider [himself] an expert in emergency medicine."  (Dr. Sexson Depo. at 121). However, Dr. Sexson's testimony here was equivocal, as he also answered affirmatively when asked whether he is "able to opine on the standard of care in emergency medicine settings."  (*Id.* at 102).  Further, Dr. Sexson explained that his "not an expert" response was founded upon the

fact that, as an internist, he did not "do the pediatrics and trauma" regularly handled in the emergency room.  (*Id.* at 120-121).  Of course, neither of Murphy's trips to the ER at the VAMC at all involved pediatrics or trauma care.  It is thus not inconsistent that Dr. Sexson might not consider himself an "expert" on all things "emergency medicine" while simultaneously believing himself "able" to address the standard of care in particular aspects as they pertain to the case. Moreover, whether a witness is qualified to testify as an expert is a legal issue for the court alone to decide.  Thus, a witness's opinion or characterization of their own qualification or expertise vel non in a certain area might be relevant, but it is not binding or dispositive.  *See Smith v. State*, 82 So. 2d 296, 298 (Ala. 1955); *Jordan v. State*, 122 So. 2d 545, 548 (Ala. Ct. App. 1960).

The United States also asserts that, Dr. Sexson "does not triage or diagnose patients" in an emergency room setting.  (Doc. 29 at 4).  It similarly insists that neither Dr. Sexson nor Dr. Donowitz "perform[ed] traditional Emergency Medicine functions of evaluating and treating acute patients … as they walk through the door" but would instead "typically be called only after this process has been performed by the emergency medicine physician who made the decision to admit the patient."  (*Id.* at 13).  It is true that Dr. Sexson does not claim to have "triaged" ER patients. However, Murphy was not triaged at the VAMC by Dr. Steil or Dr. Rudemiller, either.  It is undisputed that the task, rather, was performed by ER nurses well before Dr. Steil or Dr. Rudemiller ever saw Murphy.  (VAMC Records at 4, 11, 32, 34).  More importantly, Murphy makes no claim that anyone at the VAMC breached the standard of care related to triage.  The United States's other assertions that Dr. Sexson did not "diagnose" patients in the ER and was only called there "on the backend" (Doc. 29 at 13), after an ER physician had already decided to admit a patient, are not supported by the record.  As noted above, Dr. Sexson testified without contradiction that he went to the ER every day and spent some 30 to 40 percent of his time there.

He claims to have "performed similar activities [to Dr. Steil] as an internal medicine physician in the context of an emergency room setting" and that he both personally "evaluated" patients "in" the ER and "admitted" them to the hospital "from" the ER.  (*See also* Doc. 29 at 4 (wherein the government's brief acknowledges that "Dr. Sexson admits patients to the hospital who enter from the emergency department")).  Dr. Sexson's performance of such functions is particularly salient insofar as Murphy claims that Dr. Rudemiller breached the standard of care by discharging him home from the ER on December 3rd rather than admitting him to the hospital.  The United States's motion to exclude is due to be denied as to Dr. Sexson.

### 3.  Dr. Donowitz

The United States also seeks to exclude Dr. Donowitz on the ground that he did not "practice" emergency medicine in the year preceding the breach as required by § 6-5-548(b)(3). Dr. Donowitz is a long-time professor at the University of Virginia Medical School, where he taught internal medicine, infectious disease consulting, and courses on bacterial and fungal infections.  (Dr. Donowitz Depo. at 42, 46).  He testified that he did have "privileges to provide emergency medical care," but only as an attending physician in the early 1980s.  (*Id.* at 142).  In the year preceding the alleged breaches, by contrast, he states that he "practiced" "internal medicine and infectious disease" (*id.* at 44), "as the senior physician running the floor with two residents, two interns."  (*Id.* at 39).  He says that he would go to the emergency room, but only about four or five times every two weeks for about 20 minutes each time, "just seeing the patients that are being admitted to me from the ER."  (*Id.* at 64-66).  He similarly states generally that, "if there were acute patients in the emergency room or in an ICU, then we would make rounds again in the afternoon to see the sickest patients to make sure we were giving the right recommendations."  (*Id.* at 50).

The undersigned finds that this evidence fails to establish that Dr. Donowitz meets the specific requirements of § 6-5-548(b)(3).  The record shows that he is more than well-qualified in his specialty of internal medicine.  And it may be that he possesses knowledge in that field that overlaps with emergency medicine.  But that is not enough to qualify him under the statute.  The specific question, rather, is whether, during the relevant period, Dr. Donowitz "practiced" in the "same school or discipline" of medicine as that being practiced by the defendants at the time of the breach.  *See Hegarty*, 123 So. 3d at 951 (holding that, under § 6-5-548, board-certified obstetrician was not similarly situated to defendant board-certified in family practice, to testify to the standard of care for performing caesarian section; "The fact that there is some overlap or commonality in the[ir] practice … is irrelevant."); *id.* at 952 (Murdock, J., concurring) ("[O]ne could question the strictness of the rule chosen by the legislature and argue that, in a case such as this, [the expert], assuming he could tailor his testimony to the standard of care for a physician in the position of [the defendant], should be deemed competent to do so. This, however, is not the prescription for competence that has been written by our legislature."); *Johnson v. Price*, 743 So. 2d 436, 438 (Ala. 1999).

Murphy argues to the contrary, asserting that Dr. Donowitz was "responsible for providing care to patients in a hospital setting, including rounding on patients in the emergency room."  (Doc. 38 at 16).  Hospitals, of course, are large facilities that employ all kinds of doctors to provide all kinds of medical care.  Thus, that Dr. Donowitz "provid[ed] care in a hospital setting" does not imply that he practiced emergency medicine.  While Dr. Donowitz also says he would "make rounds" in the ER, he also admits the time he spent there was minimal, less than an hour a week on average, far less than Dr. Sexson.  Dr. Donowitz also recognized that these rounds were "just to see the patients … being admitted to [him] from the ER."  (Dr. Donowitz Depo. at 64-66).  That

renders Dr. Donowitz, unlike Dr. Sexson, aptly subject to the United States's criticism that he appears to have been typically called only after another, ER staff physician had already seen, diagnosed, and decided to admit a patient to the hospital to his care.  That is, Dr. Donowitz's testimony does not support that he performed basic emergency medicine functions regarding evaluation of patients upon their presenting to the ER, deciding himself whether to admit them to the hospital, or determining the course of care if a patient is discharged home without being admitted.  Because Dr. Donowitz does not meet the requirements of § 6-5-548(b)(3), the United States's motion to exclude his expert testimony is due to be granted.

### C.  Summary Judgment

The undersigned now turns to the United States's motion for summary judgment.  (Doc. 32).  Again, Murphy's claim is based on the FTCA and the AMLA.  To prevail, Murphy would bear the burden at trial to prove: (1) the appropriate standard of care, (2) a deviation from that standard, and (3) a proximate causal connection between the deviation and the plaintiff's injury. *Magee*, 2023 WL 4623611, at *3.  The United States argues both that the evidence does not support a breach of the standard of care or that any breach that might be shown was the proximate cause of the harm suffered by Murphy.

The undersigned again notes that Murphy defends the motion for summary judgment based in part upon expert medical testimony from both Dr. Sexson and Dr. Rudemiller.  However, because the United States's contemporaneous motion to exclude is being granted as to Dr. Donowitz based on § 6-5-548, his expert medical testimony will not be considered.  *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1313 (11th Cir. 2014) ("Evidence inadmissible at trial cannot be used to avoid summary judgment.").  On the other hand, that motion to exclude is being denied as to Dr. Sexson, so his testimony may be considered.

### 1.  Breaches of the Standard of Care.

#### a.  Alleged Breaches by Dr. Steil

Murphy's malpractice claim is essentially divided into two parts.  The first is based on omissions by Dr. Steil, which arise from his failure to follow up on the urine culture he ordered on the November 12th ER visit.  (*See* Doc. 41, at 13-16).  Murphy highlights that when that culture came back on November 15th, it undisputedly showed both: (1) as positive for enterococcus bacteria and (2) that such strain was not responsive to either of the antibiotics that Dr. Steil had prescribed on November 12th.  (*Id.*, at 13).  Murphy claims that, as the physician who saw him and ordered that test, Dr. Steil breached a duty under the standard of care to ensure that Murphy was contacted, told about the result, and given a prescription for an antibiotic effective against the enterococcus.  (*Id.*, at 14-15, 17-18).

The United States does not dispute the underlying objective events, *i.e.*, that Dr. Steil did not follow up on the urine culture test he ordered for Murphy.  However, the United States does contend that the evidence does not support that Dr. Steil's omissions in such regard violated the standard of care for emergency room doctors.  The United States here points to expert testimony from Dr. Jubanyik, the admissibility of which is not contested.  (*See* Doc. 32 at 24-25).  The evidence shows she is a licensed physician and professor of emergency medicine, that she is board-certified in emergency medicine, and that claims to have practiced that specialty during the year preceding the alleged breaches.  (*See* Dr. Jubanyik Decl. ¶¶ 2-3).  Jubanyik opines that, because of the nature of emergency room care, with its high patient turnover rate, ER "physicians do not maintain a continuity of care with their patients." (Dr. Jubanyik Decl. ¶ 15).  Therefore, she further states, it was "not within the Emergency Medicine standard of care" for such physicians to "contact and follow up with patients regarding test results that become available after a patient has been

sent home." (*Id.* ¶ 14).  This testimony is sufficient to carry the United States' initial burden on the issue at summary judgment.

Murphy responds by pointing to testimony from Dr. Sexson.  He opines that Dr. Steil was, in fact, required under the standard of care to follow up on Murphy's urine culture and to take steps to ensure that Murphy was contacted about the result and told to adjust his antibiotic regimen accordingly.  (*See* Dr. Sexson Depo. at 30, 79, 92, 98-102, 138, 162).  In this vein, Murphy also relies on two Veterans Heath Administration ("VHA") policy directives that he interprets to show that Dr. Steil was required to communicate with Murphy about the urine culture test results and adjust his antibiotic medication.  (*See* Doc. 41 at 17-18).  First, Murphy cites VHA Directive 1101.05(2), entitled, "Emergency Medicine," and dated September 2, 2016.[12]  (*See* Doc. 42-9 ("VHA Dir. 1101.05(2)")).  It states its "Reason for Issue" is to "establish[ ] policies and procedures for VHA Emergency Departments (EDs) and Urgent Care Centers (UCCs) (VHA Dir. 1101.05(2) at p. T-1, ¶ 1; Doc. 42-9 at 1), and that its "Purpose" is to "establish[ ] the minimum requirements to ensure all enrolled Veterans have access to quality emergency care,"  (VHA Dir. 1101.05(2) at p. 1, ¶ 1; Doc. 42-9 at 4).  Specifically, Murphy relies upon a provision within its Section 12, "Clinical Policies," which states:

> p.  **Ordering and Reporting Test Results**.  All test results must be communicated to the ordering provider or surrogate practitioner, within a timeframe allowing prompt attention and appropriate clinical action to be taken. The ordering practitioner is responsible for communicating these results to the patient so they may participate in health care decisions. **NOTE**: *The Emergency Department should not be given primary responsibility for test results that are not life threatening. For further details see VHA Directive 1088, Communicating Test Results to Providers and Patients.*

(VHA Dir. 1101.05(2), at p. 43, § 12(p); Doc. 42-9 at 46 (bold and italics all original)).

---

[12] VHA Directive 1101.05(2) has been rescinded and replaced by VHA Directive 1101.14, dated March 20, 2023.  *See* https://www.va.gov/vhapublications/publications.cfm?pub =1&order =asc&orderby=title (last visited November 5, 2023).  Murphy relies on VHA Directive 1101.05(2), however, because it was in effect when he was treated at the VAMC in 2018.

The other VHA Directive relied upon by Murphy is that referenced immediately above, VHA Directive 1088(1), "Communicating Test Results to Providers and Patients," dated October 7, 2015.  (*See* Doc. 42-10 ("VHA Dir. 1088(1)").  Its Section 4 sets out "Responsibilities" for various VA personnel, including an "Ordering Provider" (VHA Dir. 1088(1), at p. 4-5, § 4(f); Doc. 42-10 at 5-6), defined as "a provider authorized to enter and sign orders for diagnostic tests." (VHA Dir. 1088(1) at p. 8, § 6(d), Doc. 42-10 at 9).  In particular, the VHA Directive provides in relevant part that "each Ordering Provider … is responsible for" certain items, including as follows:

> (1) Initiating appropriate clinical action and follow-up for any orders that they have placed.
> …
>
> (4) Communicating outpatient test results to patients in accordance with the following time frame standards: all test results requiring action must be communicated by the ordering provider, or designee, to patients no later than 7 calendar days from the date on which the results are available. For test results that require no action, results must be communicated by the ordering provider, or designee, to patients no later than 14 calendar days from the date on which the results are available. Depending on the clinical context, certain test results may require review and communication in shorter time-frames (see definitions paragraph for abnormal and normal results). … All communication should occur within a time-frame that minimizes risk to the patient.
>
> …
>
> (6) Communicating test results to patients after discharge. When results of tests ordered and performed while the patient is inpatient become available after discharge, they are communicated to the patient by the ordering inpatient provider, or their designee, unless responsibility is transferred to an outpatient provider, or their designee, and the transfer is documented in CPRS [Computerized Patient Record System].  The transfer of responsibility to the outpatient provider may occur via synchronous or asynchronous communication. The requirements for transfer of responsibility, such as acknowledgment or acceptance by the outpatient provider, should be determined by the local facility. …
>
> (7) Communicating test results in acute care settings. Settings of acute care such as inpatient, emergency, or urgent care often involve extensive, repetitive

> testing with rapidly changing clinical conditions. Therefore, for patients in the
> inpatient, emergency, or urgent care setting, it is not required or expected that each
> individual test result is communicated to the patient. The ordering provider or the
> patient's care team should strive to effectively communicate relevant information
> to the patient about the patient's medical condition, as needed, to ensure the patient
> is able to engage effectively in the treatment plan. Results of specific tests may be
> included in this communication, as appropriate.

(VHA Dir. 1088(1) at p. 4-6, § 4(f) Doc. 42-10 at 5-7).   Dr. Sexson testified that these VHA

Directives "certainly codified" the relevant standard of care regarding follow-up on Murphy's

urine culture test results.  (Dr. Sexson Depo. at 33).  He further opined that Dr. Steil violated both

VA policy and the standard of care because he did not follow up on the urine culture, communicate

with Murphy about the result, or change his antibiotic prescription.  (*See id.* at 30, 79, 92, 98-102,

138, 162).

        While not specifically disputing as a factual matter that Dr. Steil did not follow-up on the

urine culture result, including by communicating with Murphy and changing his medication, the

United States does raise two counterarguments.  First, it maintains that Dr. Steil did not, in fact,

violate VA policy because VHA Directive 1088(1) includes a provision, quoted in full above, that

"[w]hen results of tests ordered and performed while the patient is inpatient become available after

discharge, they are communicated to the patient by the ordering inpatient provider … unless

responsibility is transferred to an outpatient provider … and the transfer is documented in [the

Computerized Patient Record System]."  (VHA Dir. 1088(1) at p. 6, § 4(f)(6); Doc. 42-10 at 7).

While conceding that Dr. Steil was the "ordering provider," the United States claims that, under

that provision, he was not responsible to communicate with Murphy about the urine culture test

result after it became available on November 15th, following his discharge from the ER on

November 12th.  (*See* Doc. 46 at 6-7).  The United States posits, rather, that Dr. Steil's

responsibility in such regard had been "transferred to an outpatient provider," based on the fact

that Murphy was instructed, as documented in his discharge paperwork, to "Follow up with [his] Primary Care Doctor as a walk in between 9am and 3pm Monday through Friday in 24-48 hours for a recheck and further care."  (Doc. 42-2 at 10).  However, the United States points to no testimony, evidence, or caselaw supporting that such a generalized discharge instruction to a lay patient, to "follow up" with an unscheduled visit to an unnamed "Primary Care Doctor," is itself sufficient to establish, under VHA Directive 1088(1), a "transfer" of the responsibility to follow up and act on any post-discharge test results to such a "Primary Care Doctor."  Further, nothing in the record suggests that Dr. Steil or anyone else at VAMC advised any other primary care outpatient provider on the other end that he or she had been "transferred" such "responsibilities." Suffice it to say that a jury could reasonably find from the evidence that Dr. Steil continued to have responsibility under the VHA Directive to follow up and act on the urine culture test and that he violated VA policy by failing to do so.

In its second argument, the United States contends that, even assuming the evidence supports that Dr. Steil violated a VHA Directive, "no VA policy in and of itself establishes the standard of care" (Doc. 46 at 3) and that a "deviation" from such an "internal policy does not necessarily establish a breach of the standard of care."  (Doc. 32 at 25 n. 7; *see also* Doc. 46 at 3-4).  The United States may be correct that an internal hospital policy cannot *by itself establish* the standard of care, which represents that level of care reasonably required within the national medical community more broadly.  *See Henson v. Mobile Infirmary Ass'n*, 646 So. 2d 559, 563-64 (Ala. 1994) (holding that testimony showing a violation of hospital's internal policy failed to establish a breach of the standard of care because the testimony "fails to address a community standard").  However, even the United States does not dispute that "a hospital's internal policies and bylaws may be *evidence* of the standard of care."  (Doc. 46 at 4 (*quoting Quijano v. United*

*States*, 325 F.3d 564, 567-68 (5th Cir. 2003)) (emphasis added).  Alabama observes this tort law

principle generally in its recognition that the "failure to follow company policy may be prima facie

evidence of negligence." *Morgan Keegan & Co., Inc. v. Cunningham*, 918 So. 2d 897, 903 (Ala.

2005) (*quoting Daniels v Mead Coated Board, Inc.*, 858 F. Supp. 1103, 1111 (M.D. Ala. 1994));

*see also Handley v. United States*, 2021 WL 5195814, at *7 (N.D. Ala. June 21, 2021) (holding

that, under Alabama law, "a court may consider industry standards or a private company's policies

and procedures in determining the standard of care of a member of the industry, or an employee

of the company, owes to others").   In the end, Dr. Sexson's testimony, which includes his

characterization that the VHA Directives "codify" the relevant standard of care, is sufficient to

create a jury question as to whether Dr. Steil violated VA policy and the standard of care by failing

to follow up on the urine culture test and contact Murphy to change his medication accordingly.

### b.  Alleged Breaches by Dr. Rudemiller

The  other  part  of  Murphy's  malpractice  claim  is  based  on  Dr.  Rudemiller's  conduct,

occurring when Murphy returned the VAMC emergency room on December 3rd.  (*See* Doc. 41, at

16-19).  Namely, Murphy complains that Dr. Rudemiller discharged him home at that time instead

of admitting him to the hospital.   (*Id.,* at 16-17).  Murphy again points to the testimony of Dr.

Sexson, who opines that Dr. Rudemiller breached the standard of care by failing to admit Murphy

for further observation and work-up.  (*See* Dr. Sexson Depo. at 31, 93, 97-98, 151).  In support,

Dr. Sexson highlighted that Dr. Rudemiller undisputedly had access to both the records from the

November 12th ER visit and the November 15th urine culture result, which showed that Murphy

had been diagnosed with an enterococcus UTI that had effectively gone untreated for several

weeks.  Dr. Sexson says that Dr. Rudemiller was reasonably required to review and consider these

records in his assessment of Murphy when presented again on December 3rd, particularly given

that Murphy's clinical presentation showed a recurrence of the same kinds of urinary problems as on the prior ER visit when Dr. Steil diagnosed a UTI.  Dr. Sexson opined that, given the serious adverse complications that can follow an untreated UTI over such a period, Dr. Rudemiller should have admitted Murphy to the hospital.  The United States's experts do not agree that Dr. Rudemiller was required to admit Murphy given his normal vital signs and the lack of other signs and symptoms revealing an active infection.  Even so, the jury could reasonably credit Dr. Sexson's opinion testimony, the underlying methodology of which the United States does not challenge.

The United States also makes another argument that seems directed at least in part to the question of breach of the standard of care, particularly as it relates to Dr. Rudemiller but also potentially to Dr. Steil.  Specifically, the United States asserts that, Murphy's "stroke, while unfortunate, was completely and entirely unforeseeable."  (Doc. 32 at 21).  From that premise, the United States contends broadly that it follows that "no legal duty to prevent the injury exist[ed]" on the part of the VAMC doctors and staff and that "no liability results from failing to prevent the injury."  (*Id.*)  The United States, however, is not entitled to summary judgment on this basis.

First, United States improperly relies primarily on cases involving the duty to prevent a *suicide*.  (*See* Doc. 32 at 21-22 citing *City of Crossville v. Haynes*, 925 So. 2d 944 (Ala. 2005), and *Keebler v. Winfield Carraway Hosp.*, 531 So. 2d 841 (Ala. 1988)). The Alabama Supreme Court has recognized that "'a medical-malpractice action based on a patient's suicide is different from a general medical-malpractice action,' because the foreseeability of the plaintiff's suicide is an essential element of proof in a medical-malpractice action arising out of a suicide." *Breland ex rel. Breland v. Rich*, 69 So. 3d 803, 824 (Ala. 2011) (*quoting Patton v. Thompson*, 958 So. 2d 303, 312 (Ala. 2006)).  Accordingly, in suicide cases, the "question whether the [defendant] psychiatrist knew or should have known that the patient might harm [themselves] must be addressed to

determine whether a duty to prevent [the] suicide existed." *Id.* Such a specific foreseeability element does not arise in all medical malpractice cases generally. *See id.*

Further, for an injury to be "foreseeable" under Alabama law, "it is not necessary to anticipate the specific [harm] that occurred, but only that some general harm or consequence would follow." *Bobo v. Tennessee Valley Auth.*, 855 F.3d 1294, 1305 (11th Cir. 2017) (quoting *Smith v. AmSouth Bank, Inc.*, 892 So. 2d 905, 910 (Ala. 2004)). "Thus, generally defendant may be found liable if some physical injury of the general type the plaintiff sustained was a foreseeable consequence of the defendant's negligent conduct, even though the extent of the physical injuries may have been quite unforeseeable." *Looney v. Davis*, 721 So. 2d 152, 162 (Ala. 1998) (holding that dentist could be liable in negligence for patient's death resulting from blood loss following tooth extraction). Even assuming for the sake of argument that it was not likely that Murphy would suffer a *stroke* specifically at some time or another or even at all from an untreated enterococcus UTI, the United States's argument misses the mark. There is substantial evidence that allowing that infection to go untreated might foreseeably result in a range of very serious adverse physical harm or injury within a short time frame, potentially including endocarditis, stroke, and death. Indeed, such testimony has been furnished not only by Dr. Sexson but also by Drs. Steil and Rudemiller themselves. (*See* Dr. Sexson Depo. at 79-80, 93, 97-98, 108-109, 141-142, 149); Dr. Steil Depo. at 90-91; 102; Dr. Rudemiller Depo. at 108, 129-133). Such evidence is sufficient to preclude summary judgment based on the United States's argument that Murphy's stroke was allegedly "unforeseeable."

Another case discussed at length by the government, *Hammonds* (*see* Doc. 32 at 22-23), is not to the contrary. The plaintiff in *Hammonds*, an unpublished Eleventh Circuit decision, was also a veteran who went to the VAMC in Birmingham, to see a dentist to have his teeth cleaned.

36

418 F. App'x at 854.  Because he had recently undergone hip replacement surgery, the dentist had prescribed a prophylactic antibiotic to ameliorate the risk of infection at the surgical site.  *Id.*  The plaintiff was told to take the antibiotic an hour before arriving for his dental cleaning, but he forgot to do so, and he did not alert the dentist until his cleaning was underway.  *Id.*  The dentist administered the antibiotic but continued the cleaning without delaying an hour.  *Id.*  While the plaintiff did not develop an infection at his hip surgery site, he did develop endocarditis, a heart infection, despite having no prior history of heart problems.  *Id.*  The plaintiff filed an FTCA action claiming that the dentist had breached the standard of care by failing to delay the teeth cleaning for an hour to allow the antibiotic to take effect in his system, which the plaintiff claimed would have prevented his endocarditis.  *Hammonds*, 418 F. App'x at 854-55.  This court granted summary judgment for the government, *Hammonds v. United States*, 2009 WL 10675135 (N.D. Ala. Aug. 28, 2009), and the Eleventh Circuit affirmed.  418 F. App'x at 858.  In so doing, the Eleventh Circuit recognized that the evidence was undisputed that the *sole* reason that an antibiotic might have been required at all under the standard of care was to address the risk of an infection at hip surgical site; that is, because the plaintiff had no history of heart problems, the foreseeable risk of endocarditis was itself too remote to have required antibiotics.  *Id.* at 856-858.  The Eleventh Circuit thus held that, even if the proper use of antibiotics would have prevented the plaintiff's endocarditis, there could be no malpractice liability for that injury because the required use of an antibiotic would have arisen from the mere "serendipity" of the plaintiff's having undergone the hip surgery that created a risk of a different harm that was foreseeable but that the plaintiff never actually suffered.  *Id.*

There are obvious similarities between *Hammonds* and this case.  Both plaintiffs were veterans raising FTCA claims based on medical malpractice at the same VA facility.  Both

plaintiffs suffered from endocarditis and raised claims relating to a failure to properly administer antibiotics. Even so, *Hammonds* is distinguishable. The holding and lesson of *Hammonds* is that a malpractice plaintiff may not recover for an injury that might have been prevented by a measure required under the standard of care *only because* of the happenstance risk of some other discrete harm that was foreseeable but that the plaintiff did not endure. That unusual situation is simply not present in this case. That is, Murphy makes no claim that either his endocarditis or stroke could have been prevented by different antibiotics or admission to the hospital that might have been required under the standard of care only because of the chance that Murphy could have suffered a distinctly different injury or condition that he never experienced. Murphy claims, rather, that Drs. Steil and Rudemiller failed to take such steps reasonably required to address Murphy's diagnosed enterococcal UTI that, left untreated, could, according to the testimony, foreseeably result in further serious complications, which might include endocarditis and stroke. The United States is not entitled to summary judgment based on *Hammonds*.

### 2. Proximate Cause

Finally, the United States moves for summary judgment by claiming that Murphy cannot present sufficient evidence that his stroke and related injuries were the proximate result of the alleged breaches of the standard of care discussed above. (*See* Doc. 32 at 29-32; Doc. 46 at 7-10). Namely, the United States contends that the evidence does not support that, had Dr. Steil followed up on the Murphy's urine culture test result from November 15th and timely contacted him to prescribe an antibiotic effective against the enterococcus infection, such course would have prevented Murphy's endocarditis and stroke. (*See* Doc. 32 at 23-24; Doc. 46 at 7-8). The United States likewise claims that Murphy's stroke would not have been prevented even if Dr. Rudemiller

had admitted him to the hospital from the ER on the evening of December 3rd.  (*See* Doc. 32 at 24-25; *Doc. 46* at 9-10).

Under Alabama law, "the issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of inferior medical care.  It is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence."  *Looney v. Moore*, 886 F.3d 1058, 1063 n. 4 (11th Cir. 2018) (quoting *Parker v. Collins*, 605 So. 2d 824, 827 (Ala. 1992)).  "The Alabama Supreme Court has made clear that, 'to present a jury question, the plaintiff in a medical-malpractice action must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) *probably* caused the injury. A mere possibility is insufficient.'"  *Id.* (quoting *Cain v. Howorth*, 877 So. 2d 566, 576 (Ala. 2003) (alterations in *Cain* omitted in *Looney*; emphasis supplied in both *Looney* and *Cain*)).

In support of its motion, the United States relies on the testimony of its own medical experts, who opine that: (1) it is likely that Murphy already had endocarditis before he first went to the emergency room on November 12th, (2) even a standard course of antibiotics effective against enterococcus begun after November 15th likely would not have cured the allegedly pre-existing endocarditis, (3) and that even if Murphy had been admitted to the hospital on December 3rd, it would not have prevented his stroke or likely made any significant difference in his treatment or ultimate outcome.  (*See* Doc. 46 at 8-10).  It might be assumed that a jury could believe such testimony.

On a motion for summary judgment, of course, the evidence must be viewed in the light most favorable to Murphy, the non-movant.  He seeks to prove proximate cause by expert testimony from Dr. Sexson.  He opines that Murphy had an untreated enterococcus UTI which incubated for a number of weeks; the bacteria entered the blood and made its way to his heart valve, causing endocarditis at some point following the November 12th ER visit, which, in turn, caused the stroke on December 4th.  (Dr. Sexson Depo. at 104-105, 108-109, 117-118, 160).  As noted previously, not only Dr. Sexson but also Drs. Steil and Rudemiller generally acknowledged that it is foreseeable that an enterococcus UTI left untreated can result in very serious complications that can potentially include endocarditis and stroke.  (*See* Dr. Sexson Depo. at 26-27, 67-68, 70-74, 97-98, 108-109, 141-142, 149, 163; Dr. Steil Depo. at 90-91; 102; Dr. Rudemiller Depo. at 108, 129-133).  Dr. Sexson further testified that, had a standard course of antibiotics effective against enterococcus been prescribed around November 15th, it would have likely prevented the endocarditis and stroke.  (*Id.* at 103-105, 139, 154-155).  He also opined that, had Murphy been admitted to the hospital on the evening of December 3rd, even if he still might have had the stroke when he did, he could have been treated much more quickly, making it probable that his outcome would have been materially improved.  (*Id.* at 31-32, 107-108, 151-153).

The United States asserts that Dr. Sexson's opinion that Murphy contracted endocarditis after the November 12th ER visit amounts to "mere speculation."  (Doc. 46 at 8).  However, the United States has not moved to strike Dr. Sexson's testimony on the basis that his expert medical opinions lack a reliable methodology or basis.  *See, e.g., Smith v. United States*, 2023 WL 5011730 (11th Cir. Aug. 7, 2023); *see also generally Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  The United States also claims that Murphy has presented "no evidence" contradicting the government's experts'

40

testimony that a course of antibiotics effective against enterococcus likely would not have cured his pre-existing endocarditis.  (Doc. 46 at 8-9).  But such simply ignores Dr. Sexson's above-described causation testimony directly to the contrary.  Finally, the United States insists that Dr. Sexson's assertion that Murphy's outcome would have likely been improved had Dr. Rudemiller admitted him to the hospital is "provably false," but all the United States does in support is to emphasize that its own experts disagree.  (*Id.* at 9-10).  Again, the non-movant's evidence must generally be credited on summary judgment, as credibility determinations are for the jury.  The undersigned concludes, based upon Dr. Sexson's testimony, that the United States is not entitled to summary judgment on the basis that the evidence is insufficient to establish proximate causation.

## IV. Conclusion

Based on the foregoing, it is **ORDERED** as follows:

(1)     The United States' Motion to Exclude Two of Plaintiff's Expert Witnesses (Doc. 29) is **GRANTED IN PART AND DENIED IN PART**; it is **GRANTED** to the extent it seeks to exclude the expert medical testimony from Dr. Gerald Donowitz but **DENIED** as it relates to such testimony from Dr. James Sexson.

(2)     The United States' Motion for Summary Judgment (Doc. 32) is **DENIED**.

**DONE** this 12th day of January, 2024.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE